UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                               :

MARIA DIAZ,                         :

                   Plaintiff,     :

                                 :

       - against -        :

                                 :

POLY PREP DAY SCHOOL,     :

                                 :

                Defendant.   :

                                 :

--------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

21-cv-06611 (BMC)

**COGAN**, District Judge.

      Plaintiff Maria Diaz brings this action against her former employer, Poly Prep Day School, alleging claims of racial and national origin discrimination, retaliation, and creation of a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and corresponding state ("NYSHRL") and city statutes ("NYCHRL"). Defendant moves to dismiss her complaint for failure to state a claim.

      Plaintiff's complaint alleges nothing other than the familiar, false syllogism that she is a member of a minority group; she doesn't like the way she was treated at work; and because she is a member of a minority group, that treatment must have been based on her race. See House v. Wackenhut Servs., Inc., No. 10-cv-9476, 2012 WL 4017334, at * 1 (S.D.N.Y. Aug. 20, 2012). She tries to save her claims by alleging various non-minority comparators, but her comparators are not at all comparable. When the statement that led to her termination – a suggestion that a Jewish colleague who wanted to vacation "someplace warm" could be "throw[]n … in an oven to keep her warm" – is added to the mix, it is clear that she lacks a plausible claim of improper termination. Defendant's motion to dismiss is therefore granted.

## BACKGROUND

I.   **Factual Background**

A.   **Plaintiff's Initial Complaint**

Poly Prep is an independent day school with two campuses in Brooklyn, consisting of an upper and a lower division.  From September 2019 to December 2020, plaintiff, a multi-racial female of Hispanic descent, was employed as a Learning Support Specialist.  From the outset, plaintiff encountered difficulties with her Caucasian supervisor, Juliet Moretti, the Chair of the Enrichment and Learning Support Department.

Shortly after her employment began in September 2019, plaintiff, following Moretti's instructions, emailed the parents of one of her assigned students to introduce herself.  This introduction went poorly.  The parent was offended that she had waited so long to reach out, and when plaintiff attempted to apologize, she wound up accidentally misgendering the student.  The parent complained, requesting a phone call with Moretti and plaintiff's other supervisor, Amie Bui.  During the phone call, plaintiff alleges that Moretti agreed that plaintiff would "have no contact whatsoever with this Parent's children."

Following the incident, plaintiff was upset that Moretti had not defended her as a "well-intentioned, competent staff member."  She notes that two other, Caucasian Learning Specialists, Sarah Bond and Victoria Finnocchiario, also "experienced issues with Parents" but that "their issues were never escalated the way [her] mistake was" and that "Moretti almost never got involved."  She felt that she was unduly singled out and subject to disparate treatment because of her race and national origin.

Plaintiff brought up her concerns to Moretti during a previously scheduled one-on-one meeting on September 19, 2019.  She expressed her frustration with how Moretti had handled the

situation, particularly because she "felt that the school did not have [her] back." Plaintiff also informed Moretti that she believed that she had been treated this way because of her race.

Following her complaint, plaintiff's relationship with Moretti further deteriorated. Soon after, she alleges that Moretti began to discriminate against her in various ways because of her race and national origin, as well as in retaliation for her earlier complaint.

Throughout the fall, plaintiff contends that Moretti became "increasingly condescending" towards her in various meetings and began to "berate" her. Moretti also asked her to do things that she had already done and would essentially "babysit" her. She also brushed off plaintiff's worries when she attempted to bring up a concern regarding students receiving enough time for exams. By contrast, plaintiff notes that Moretti did not behave this way with Finnocchiario or Bond. Instead, Moretti would "agree with and compliment everything" that Finnocchiario said in meetings and did not micromanage or ask these two employees to perform redundant tasks.

### B.     Plaintiff's Second Complaint

On January 28, 2020, a student had a panic attack in plaintiff's presence. Plaintiff texted Bui, her supervisor, for support. Finnocchiario, who also was present, instead texted the school counselor, Courtney Birch.

That evening, Moretti e-mailed plaintiff, wanting to start a dialogue about what had occurred. In her view, Finnocchiario had done the proper thing by addressing the panic attack and getting the school counselor. As plaintiff had not handled the situation in exactly the same way, she wanted to go over potential strategies to help plaintiff deal with similar situations in the future. In plaintiff's view, Moretti's criticism was unfair because she and Finnocchiario had "both done the exact same thing." She responded to Moretti's e-mail, "pointing out this double standard" and "complaining that it seemed to be motivated by [her] race."

3

In the same message, plaintiff requested that Human Resources step in. She also brought up other substantive concerns, including that some teachers were not giving students their allotted time for exams. The next day, Moretti explained to plaintiff that she was incorrect on this issue. In response, plaintiff told Moretti that she was tired of being "constantly undermined" and felt that her treatment was unfair compared to Finnocchiario. Plaintiff then alleges that "Moretti began to yell at [her] and shout that [she] has no idea what [she] is talking about and that [she] would have no idea what she does to others."

Pursuant to her request, on February 7, 2020, plaintiff met with Devon Winfield, a Human Resources employee, and Motoko Maegwa, Director of Diversity, Equity, and Inclusion, about the situation with Moretti. During the meeting, Winfield asked plaintiff whether she enjoyed working at Poly Prep. After she responded that she did, Winfield told her that, they should handle this matter "in house". Maegwa clarified that she would "investigate" and "we'll find a resolution within Poly" so that they could "honor[] everyone here . . . so it does not get out of hand." Plaintiff later stated that she interpreted these statements as a threat to terminate her in retaliation for her complaint.

The investigation continued, and on February 28, 2020, Winfield reached out to plaintiff to schedule a follow-up meeting. However, the meeting was postponed because plaintiff contracted COVID soon after. Winfield followed up again in late April, and they met in the first week of May. Winfield explained that she believed that plaintiff's issue with Moretti was not a racial issue but rather a "space issue." After plaintiff confirmed that she wanted to continue working at Poly Prep and was willing to try to repair the relationship with Moretti, the parties began to figure out a way forward. Moretti, Winfield, and plaintiff met over the summer to

discuss ideas of how to rebuild the relationship, and both were directed to copy other parties on all communications they had.

### C.     Further Incidents Occur

Over the summer break, Moretti, trying to plan for the following semester, asked whether plaintiff wanted to work with students in the 9th or 7th grade.  Plaintiff responded that she would like to work with students from both grades.  Ultimately though, this was not possible; later in the summer, Moretti informed her that Learning Specialists could not work across the upper and lower divisions due to COVID.

After the start of the school year, plaintiff claims that despite Moretti's statements, certain teachers were "given multiple classes," including two male, Caucasian teachers. Additionally, one Learning Specialist, Bond, who is Jewish, was given "many grades" and "allowed to work across divisions" and "maintain her allotted caseload."  By contrast plaintiff alleges that her "caseload had changed completely" and that "the number of students was reduced."

### D.     Defendant Fires Plaintiff

On December 15, 2020, plaintiff attended another counseling meeting relating to her allegations.  At the beginning of the meeting, Karen Ezra, the school psychologist, who is also Jewish, mentioned that she wanted to go somewhere warm for the holidays, like Mexico.  This prompted plaintiff to text Bond that "we could throw her in an oven if she wanted to be warm." Bond immediately told plaintiff that she "should not make those types of jokes."[1]

The following day, Winfield and another employee met with plaintiff about the text message.  Although plaintiff alleges that she "tried to explain that she was not thinking of

---

[1] Plaintiff also alleges that she "immediately apologized" when she "realized her joke did not go over as intended."

anyone's background and merely making a joke about warm weather," Bates and Winfield did

"not listen" to her explanations.  They told her the text exchange with Bond was hate speech.

After this meeting, plaintiff immediately sent an apology email to Winfield fully explaining the

situation.  She also "express[ed] surprise about how quickly this situation was handled" because

her "complaints of discrimination, harassment and retaliation were not handled in any sort of

quick or efficient manner."

Approximately two days later, plaintiff was informed that her employment would be

terminated, effective December 18, 2020.  When plaintiff received her final paycheck, it was for

a different, lesser amount than Winfield had earlier indicated she was due.

## II.    Procedural History

Following her termination, plaintiff filed an EEOC complaint against defendant alleging

that she had been discriminated against based on her race or national origin and retaliated against

for complaining.  Plaintiff was issued right-to-sue letters, and brought her discrimination, hostile

workplace environment, and retaliation claims here.

After plaintiff amended her complaint, defendant moved to dismiss, which is the motion

that I will now consider.

## DISCUSSION

## I.    Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a

complaint for failure to state a claim upon which relief can be granted.  In deciding a motion

under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accept[ ] all factual

allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor."

Elias v. Rolling Stone LLC, 872 F.3d 97, 104 (2d Cir. 2017) (quoting Chase Grp. All. LLC v.

City of New York Dep't of Fin., 620 F.3d 146, 150 (2d Cir. 2010)).  To survive a motion to

dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), and to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

"In certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6)." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007).  "When determining the sufficiency of plaintiff['s] claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in [the] complaint, documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

## II.    Title VII and NYSHRL Racial and National Origin Discrimination

### A.  Legal Standard

Title VII makes it unlawful for an employer "to discriminate against any individual . . . because of such individual's race . . . or national origin." 42 U.S.C. § 2000e–2(a)(1).  To establish a *prima facie* case of employment discrimination under Title VII or the NYSHRL, a plaintiff must ultimately prove that: "(1) plaintiff is a member of a protected class; (2) plaintiff was qualified for . . . her position; (3) plaintiff was subjected to an adverse employment action; and (4) the adverse employment action took place under circumstances giving a rise to an inference of discrimination based on plaintiff's membership in the protected class." El–Din v. N.Y.C. Admin. for Children's Servs., No. 12-cv-1133, 2012 WL 3839344, at *4 (S.D.N.Y. Sept. 5, 2012) (citing Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010)); see also

Love v. Premier Util. Servs., LLC, 186 F. Supp. 3d 248, 252 (E.D.N.Y. 2016) ("It is well-settled

that discrimination claims under the NYSHRL are also analyzed using the standards applicable

to Title VII claims.") (citing Knox v. Town of Southeast, 599 Fed. App'x. 411, 413 (2d

Cir.2015)).

At the motion to dismiss stage, a plaintiff "is not required to plead a *prima facie* case

under McDonnell Douglas." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 84 (2d Cir.

2015).  Instead, "[t]he facts alleged must [only] give plausible support to the reduced

requirements that arise under McDonnell Douglas in the initial phase of a Title VII litigation."

Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015).  For racial or national origin

discrimination claims under Title VII, "a plaintiff must plausibly allege that [i] the employer

took adverse action against [her] and [ii] [her] race . . . or national origin was a motivating factor

in the employment decision."  Vega, 801 F.3d at 86.

   *i.   Adverse Employment Action*

A plaintiff plausibly alleges an adverse employment action if she "endures a materially

adverse change in the terms and conditions of employment" that is "more disruptive than a mere

inconvenience or an alteration of job responsibilities."  Raspardo v. Carlone, 770 F.3d 97, 125-

26 (2d Cir. 2014) (internal quotations omitted).  Examples include "termination of employment,

a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, significantly diminished material responsibilities, or other indices . . .  unique to a

particular situation."  Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) (quotations

omitted).  But a "bruised ego," a "demotion without change in pay, benefits, duties, or prestige,"

or "reassignment to [a] more inconvenient job" are all insufficient to constitute a tangible or

materially adverse employment action.  Brand v. New Rochelle City Sch. Dist., No. 19-cv-7263,

2022 WL 671077, at *9 (S.D.N.Y. Mar. 7, 2022) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). Such inconveniences do not constitute adverse employment actions unless they are accompanied by "some attendant negative result, such as a deprivation of a position or opportunity." Id. (quoting Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 354 (S.D.N.Y. 2006) (internal citation and quotations omitted)).

In addition to her termination,[2] plaintiff alleges several discrete actions that she characterizes as "adverse employment actions" and that were ostensibly animated by discriminatory animus based on her race or national origin. These include allegations that Moretti: (1) failed to "stick[] up" for her during an interaction with a parent; (2) berated and acted condescendingly towards her at meetings; (3) excessively monitored her; (4) assigned her frivolous, redundant tasks; (5) unjustifiably reprimanded her; and (6) declined to give plaintiff her preferred assignment. Plaintiff also contends that Poly Prep failed to promptly investigate her complaints of discrimination and that, when faced with her complaints, threatened to terminate her.

Aside from her termination, none of these incidents legally rise to the level of adverse employment actions under Title VII or the NYSHRL. Critically, none of these actions altered the terms and conditions of her employment; she was never demoted, her compensation remained unaltered, and her responsibilities themselves do not appear to have materially or significantly changed.

---

[2] Plaintiff also has alleged that her final paycheck was for an amount less than she was told at the time of her termination. Correctly plead, withheld compensation would be an adverse employment action under Title VII or the NYSHRL. However, plaintiff never alleges that defendant in fact owed her these monies. Without such allegations, all that her complaint appears to state is that defendant told her the incorrect amount due to her, and later sent her the amount it actually owed her. Her allegations relating to this do not state a claim, discriminatory or otherwise.

Although plaintiff alleges that she was reprimanded, micromanaged, assigned redundant tasks, condescended to, berated, and not given her preferred assignments, she fails to allege that she suffered any material negative consequences in the terms of her employment because of any of these incidents.  See Meder v. City of N.Y., No. 05-cv-0919, 2007 WL 1231626, at *4, *12 (E.D.N.Y. Apr. 27, 2007) ("written and oral criticisms . . . even if unjustified, are not adverse employment actions" and that "even if [the plaintiff's supervisors] subjected [her] to more monitoring than they did other teachers, that is not sufficiently material to change her conditions of employment to count for . . . antidiscrimination purposes"); Gilbert v. Stony Brook Univ., No. 21-cv-2273, 2022 WL 409716, at *6 (E.D.N.Y. Feb. 10, 2022) (no adverse employment action where "defendants micromanaged her" and "stripped her of certain job duties and functions through increased supervision" where plaintiff fails to "allege any change in renumeration, and her responsibilities themselves do not appear to have significantly changed, even if she was subjected to increased supervision"); Castro v. N.Y.C. Bd. of Educ. Pers., No. 96-cv-6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) ("although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions.").[3]

Regarding the altercation with the parent, plaintiff alleges that she was "punish[ed]" when Moretti "agreed that [she] would have no contact whatsoever with this Parent's children."

---

[3] The cases that plaintiff cites to the contrary in this section are either distinguishable or not accurately characterized. For example, she cites to Bryant v. Begin Manage Program, 281 F. Supp. 2d 561 (E.D.N.Y. 2003), for the proposition that exclusion from staff meetings is an adverse employment action.  Looking past the fact that at no point did plaintiff allege that she was excluded from staff meetings – she only alleges that she was berated and condescended to at them, which, at most, could be viewed as constructive exclusion – she egregiously misstates Bryant's holding.  Indeed, the court noted that the exact opposite is typically true as "[e]xclusion from staff meetings is usually not in itself an adverse employment action." Id. at 567 n.4. (citing Spencer v. City Univ. of New York, 932 F. Supp. 540, 549 (S.D.N.Y.1996)).  The court only found that the plaintiff's exclusion was an adverse employment action due to the specific facts before it: there her "termination [was] intertwined with her exclusion from the meetings because her termination resulted, in part, on her failure to attend these meetings."  Id.

But reassigning and directing her to not have contact with one student – whose parent who was upset that she misgendered her child, mistakenly or not – is not a "material" change in her conditions of employment.[4]  Her attempts to characterize this incident in her briefing as an "administrative restraining order" that "humiliated" her are unavailing, and belied by her lack of factual allegations in the complaint to this point.

Nor is not receiving her desired class assignment an adverse employment action. Plaintiff is correct that "[i]n limited circumstances, a reassignment can provide that materially adverse change in the terms and conditions of employment."  Bonaffini v. City Univ. of New York, No. 20-cv-5118, 2021 WL 2206736, at *2 (E.D.N.Y. June 1, 2021).  In "the educational context . . . a reassignment" would only be materially adverse "if the new responsibilities are 'materially less prestigious, materially less suited to [a plaintiff's] skills and expertise, or materially less conducive to career advancement.'"  Id. (quoting Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000)).  Accordingly, in Bonaffini, I found that the cancellation of an Italian teacher's courses, and his reassignment to teach English courses, were materially adverse, as such reassignment was plainly less suited to his skills and ability to advance.

The same cannot be said here.  Moretti offered plaintiff her preference of lower or upper division students,[5] and she does not allege that an assignment to a specific grade would be "materially less suited" to her skills or "conducive to career advancement."  Id.  See Francis v.

---

[4] Moretti may have been doing plaintiff a favor here.  Taking the allegations in the complaint as true, this parent became so upset that she complained to plaintiff's supervisor merely because plaintiff had not reached out to her over the summer (before plaintiff had even begun working at Poly) and accidentally misgendered her child once. Such a parent might be difficult for any employee to deal with, let alone a brand new one.  Moretti may have felt that the best way to "stick up" and "defend" plaintiff was to remove her from a potentially toxic situation with an problematic parent.

[5] Plaintiff did not include this factual allegation this in her complaint.  Defendant, however, provided the e-mail in which it was contained as an exhibit to its motion to dismiss.  The Court may consider this e-mail at the motion to dismiss stage as it is both a "document[] . . . in plaintiff['s] possession" and incorporated by reference in the complaint.  Brass., 987 F.2d at 150.

Elmsford Sch. Dist., 263 F. App'x 175, 177 (2d Cir. 2008) (plaintiff transferred from teaching second grade in a classroom to teaching Academic Intervention Services in a hallway); Rodriguez v. Bd. of Ed. of Eastchester Union Free Sch. Dist., 620 F.2d 362, 366 (2d Cir. 1980) (art teacher's reassignment to the elementary school was adverse because "the art programs at the elementary level were so profoundly different from those in the junior high school as to render utterly useless her twenty years of experience and study in developing art programs").

Plaintiff alleges that, because of her reassignment, her "caseload had changed completely" and that "the number of students was reduced." However, these vague factual allegations are not enough to plausibly allege a material change in the terms and conditions of her employment. Without more information, the Court is left to guess at whether this was material – a reduction in the number of students could mean one less student, or twenty, and might be totally unrelated to her reassignment. Moreover, even if the number of students was reduced significantly, this would not necessarily translate into "significantly diminished material responsibilities." Feingold, 366 F.3d at 152. Although the actual number of students might be lower, her work load itself might not be lessened – for example, plaintiff might be working with more advanced or difficult students that required more preparation. In fact, that the number of students was reduced might be *because* her workload was changed.

The Court also does not find that her allegations that defendant threatened to terminate her during the February 2020 Human Resources meeting can be plausibly interpreted the way plaintiff would like. Rather, on the face of the complaint, defendant merely was attempting to defuse the situation, reassure plaintiff, and ensure that the issue could be handled without resorting to litigation. Contrary to plaintiff's allegations, defendant's statements that there was

"no reason to let this get out of hand" and that this could be handled "within" Poly just as plausibly suggests the *opposite* of a threat to fire her.[6]

Taking longer to investigate her early complaints than her "throw [the Jew] in an oven" statement that led to her termination also is not plausibly an adverse employment action. The type of complaints at issue were entirely different, the latter being discrete, not dependent on characterization, backed up by evidence, and egregious. Any delay is readily attributable to plaintiff's COVID-19. The investigation into plaintiff's claims was just picking up in late February 2020 when plaintiff became ill.

Plaintiff also argues that even if the individual actions were not individually adverse, they may still aggregate into adverse actions. See Lall v. City of N.Y., No. 17-cv-3609, 2021 WL 848851, at *22 (E.D.N.Y. Mar. 5, 2021). But where courts have considered incidents in aggregate, the incidents themselves still must result in a material deprivation. Id. (noting a deprivation of material responsibilities). Plaintiff has not alleged any such deprivation.

Plaintiff has failed to allege sufficient facts to plausibly support her conclusions. Without more, mere conclusory statements that she was "berated" or "baby[sat]" do not allow the Court to plausibly infer that aggregation would save her claim.

## III.   Discriminatory Intent

Accordingly, plaintiff has only plausibly alleged one discriminatory adverse employment action under Title VII and the NYSHRL – her termination. But she has failed to adequately allege that her termination occurred because of a discriminatory intent based on her race or national origin.

---

[6] Even if these statements could reasonably be construed as a threat to terminate, "[t]reats of termination do not, by themselves, constitute an adverse employment action."  See Weisbecker v. Sayville Union Free Sch. Dist., 890 F. Supp. 2d 215, 234 (E.D.N.Y. 2012).

"[T]he 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that an adverse employment decision was motivated at least in part by an 'impermissible reason.'" Vega, 801 F.3d at 87. "A plaintiff can meet that burden through direct evidence of intent to discriminate or by indirectly showing circumstances giving rise to an inference of discrimination" Id. "At the pleadings stage, then, a plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason[.]" Id. (emphasis added) (internal citations omitted). Further,

> [a]n inference of discrimination can arise from circumstances including, but not limited to, "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."

Littlejohn, 795 F.3d at 312 (quoting Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009)).

Plaintiff does not allege any direct evidence of discrimination, nor does she allege that any remarks were made about her or other employees in the protected group. Her race and national origin were never mentioned at all. Instead, she argues that discriminatory animus can be inferred from the favorable treatment of other employees.

Although an inference of discrimination may arise from the employer's more favorable treatment of employees not in the protected group, Leibowitz, 584 F.3d at 502, a plaintiff attempting to show that the employer treated her less favorably than a similarly situated employee outside her protected group must show she was "similarly situated in all material respects" to the individuals with whom she seeks to compare herself. Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (internal citation and quotations omitted)). "Although the question of 'whether two employees are similarly situated presents a question of fact, rather than a legal question to be

14

resolved on a motion to dismiss,' 'it is insufficient for a plaintiff to make naked assertions of disparate treatment without factual allegations indicating those employees were treated differently while similarly situated.'" Colon v. City of New York, No. 19-cv-10435, 2021 WL 4427169, at *11 (S.D.N.Y. Sept. 26, 2021) (quoting Brown v. Daikin Am. Inc., 756 F.3d 219, 230 (2d Cir. 2014).

Plaintiff argues that her firing was discriminatory as it was a "was a disproportionately harsh reaction" and in "sharp contrast to HR's disproportionately lenient reaction to the intentional, more severe discrimination and harassment Plaintiff complained of from Ms. Moretti." But Moretti could hardly be less comparable. The alleged discriminatory behavior against each of them is dissimilar in all respects. Plaintiff cannot plead a discrimination claim based on her "mere subjective belief that she was discriminated against because of her [race and/or national origin]." Henry v. New York City Health & Hosp. Corp., 18 F. Supp. 3d 396, 410 (S.D.N.Y. 2014).[7]

Plaintiff's claims under Title VII and the NYSHRL for discrimination based on her national origin and race are dismissed.

**IV.    Title VII and NYSHRL Hostile Work Environment**

Plaintiff's claim that she was subjected to a hostile work environment based on her race or national origin also fails.

"To state a claim for a hostile work environment in violation of Title VII [or the NYSHRL], a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive – [that it] creates an environment that a reasonable person

---

[7] Additionally, plaintiff does not allege that Moretti had any role in her termination. Therefore, any discriminatory animus she may have displayed is irrelevant.

would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives

as hostile or abusive; and (3) creates such an environment because of the plaintiff's" race or

national origin.  Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) (internal quotations omitted);

see also Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 n.4 (2d Cir. 2014)

("same standards [as are applied to Title VII] apply to the plaintiffs' hostile environment claims

arising under the NYSHRL.").

To allege that conduct was objectively severe or pervasive, a plaintiff "must demonstrate

either that a single incident was extraordinarily severe, or that a series of incidents were

sufficiently continuous and concerted to have altered the conditions of her working

environment." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotations

omitted).  "In determining whether a plaintiff suffered a hostile work environment, we must

consider the totality of the circumstances, including the frequency of the discriminatory conduct;

its severity; whether it is physically threatening or humiliating, or a mere offensive utterance;

and whether it unreasonably interferes with an employee's work performance." Littlejohn, 795

F.3d at 321.

Plaintiff has failed to allege any facts that plausibly demonstrate even a single race-based

incident. She therefore attempts to buttress her hostile work environment claims by relying upon

various incidents that plaintiff contends were directed at her because of her race, but which on

their face are racially neutral.

But plaintiff's allegations cannot support a hostile work environment claim.  Although

actions that are racially neutral on their face can be considered in assessing the totality of the

circumstances for a hostile work environment claim, there must be "some circumstantial or other

basis for inferring that [such] incidents . . . were in fact discriminatory."  Alfano, 294 F.3d at

378.  Here, there is no such basis.  See Parekh v. Swissport Cargo Serv., Inc., No. 08-cv-01994,

2009 WL 290465, at *5 (E.D.N.Y. Feb. 5, 2009) (complaints concerning unfair disciplinary

actions and workplace assignments did not contain suggestion of hostility or offensiveness, nor

that they were engaged in because of plaintiff's race).

      Moreover, none of the incidents about which plaintiff complains are sufficiently severe or

pervasive that they create a hostile work environment.  This is because "Title VII does not

establish a general civility code for the American workplace."  Petrosino v. Bell Atl., 385 F.3d

210, 223 (2d Cir. 2004).  Taken together, plaintiff's allegations – which are devoid of supporting

facts indicating their frequency or effect on her work performance – cannot support a finding of a

hostile work environment that is so severe or pervasive as to have altered the conditions of her

employment under Title VII.  See Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 119 (2d

Cir. 2010) (no hostile work environment when supervisor wrongly excluded plaintiff from

meetings, excessively criticized plaintiff's work, refused to answer work-related questions,

imposed duties outside plaintiff's responsibilities, threw books, and sent insulting e-mails).  Even

the cases that plaintiff cites evidence mistreatment that is much more egregious and pervasive

than what she alleges here.  See Raniola v. Bratton, 243 F.3d 610, 622–23 (2d Cir. 2001) (a

coworker wrote "c--t" across plaintiff's name on the police ledger and her supervisor threatened

to shoot her in the "f---ing head", made derogatory comments, gave unfair and undesirable

assignments, falsely disciplined her and put her a "hit list" for termination); Levitant v. City of

New York Hum. Res. Admin., 625 F. Supp. 2d 85, 98–101 (E.D.N.Y. 2008) (supervisors

repeatedly commented on plaintiff's race and national origin, telling him Russians should drink

toilet water, physically assaulting and threatening him, mocking his Russian accent, and

forbidding him from speaking Russian in the workplace).

Plaintiff's Title VII and NYSHRL hostile work environment claims are therefore dismissed.

## V.      Title VII and NYSHRL Retaliation

"To establish a *prima facie* case of retaliation, an employee must show '(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003) (internal citations omitted); Rivera, 743 F.3d at 20 n.4 ("same standard applied under the NYSHRL.  However, for a retaliation claim to survive a motion to dismiss, a plaintiff need only "plausibly allege that: (1) defendants discriminated – or took an adverse employment action – against [her], (2) because [s]he has opposed any unlawful employment practice." Vega, 801 F.3d at 90 (internal quotations omitted).

At the motion to dismiss stage, "causation may be inferred from close temporal proximity.  Chung v. City Univ. of New York, 605 F. App'x 20, 23 (2d Cir. 2015).  Although there is no bright-line rule, "a period of greater than three months is too attenuated to provide a basis to infer retaliation." Sealy v. State Univ. of New York at Stony Brook, 834 F. App'x 611, 614 (2d Cir. 2020); see also Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (time periods greater than three months insufficient to infer causal relationship); Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85–86 (2d Cir. 1990) (gap of approximately three months insufficient).

It is undisputed that plaintiff complained multiple times to defendant about discrimination.  Nevertheless, her allegations that she was retaliated against for these complaints

fail for one of two reasons: either she has not plausibly alleged an adverse employment action or, where she has, the adverse-action is too attenuated.

Plaintiff alleges that several retaliatory adverse employment actions occurred almost immediately after her initial complaint to Moretti in September 2019.[8]  Although the timing of these actions could support an inference of retaliatory animus, none of these actions meet the standard required.  Although an adverse employment action in the context of a retaliation claim "covers a broader range of conduct than does the adverse-action standard for claims of discrimination," and is therefore "not limited to discriminatory actions that affect the terms and conditions of employment" Vega, 801 F.3d at 90, this range is still not limitless.  Such an action must be capable of "dissuad[ing] a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).

None of these adverse-actions meet that standard.  Plaintiff's own actions are proof of this – she herself was not dissuaded from complaining of discrimination four months after her initial complaint.  See Matthews v. Corning Inc., 77 F. Supp. 3d 275, 298 (W.D.N.Y. 2014) ("By Plaintiff's own implied admission, the alleged harassment did not dissuade her from continuing to complain about alleged discrimination" and therefore was not actionable).

The other two adverse-actions she alleges – her reassignment during the summer of 2020 and her termination in December 2020 – fail because both were too attenuated from her complaints in September 2019 and January and February 2020 to raise an inference of retaliation.  See, e.g., Sealy, 834 F. App'x at 614 ("a period of greater than three months is too

---

[8] The same presumption would apply to the threat of termination during her February 2020 Human Resources meeting.  However, as discussed *supra*, her complaint does not plausibly allege that defendant threatened to terminate her.  Therefore, this is both not evidence of any retaliatory intent nor an adverse employment action.

attenuated to provide a basis to infer retaliation.").[9]  Moreover, "[w]hile a Plaintiff may use temporal proximity to establish causation . . . she may only do so if there are no other allegations that otherwise undercut but-for causation."  Amaya v. Ballyshear LLC, 295 F. Supp. 3d 204, 222 (E.D.N.Y. 2018) (citing Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013)).  Plaintiff's admissions that she was terminated because of her own discriminatory behavior are exactly the sort of allegations that undercut but-for causation.

Plaintiff's Title VII and NYSHRL retaliation claims are therefore dismissed.

## VI.   City Law Claims

"[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine–judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims."  Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 727 (2d Cir. 2013) (citation and quotations omitted).  In several respects, the City law applies a different standard than Title VII.  Given that plaintiff's federal law claims all have been dismissed, the Court declines to exercise supplemental jurisdiction over her City law claims.

---

[9] The Court also rejects plaintiff's argument that the longer gaps prior to these two incidents may be bridged by an "intervening pattern" of adverse treatment.  Unlike in the cases she cites, there was no "escalating, negative conduct toward [her] . . . until an opportunity to fire her presented itself."  Behringer v. Lavalle Sch. for the Blind, No. 08-cv-4899, 2010 WL 5158644, at *11 (S.D.N.Y. Dec. 17, 2010).

**CONCLUSION**

Defendant's motion to dismiss is granted. Plaintiff's federal claims and state law claims are dismissed with prejudice, and her City law claims are dismissed without prejudice.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____
U.S.D.J.

Dated: Brooklyn, New York
      July 16, 2022